EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ex Parte: <br><br> Asociación de Periodistas de Puerto Rico (ASPRO), El Taller de Fotoperiodismo, Inc., la Asociación de Fotoperiodistas de Puerto Rico y El Overseas Press Club | 2013 TSPR 127 <br><br> 189 DPR ____ |

Número del Caso: MC-2013-59

Fecha: 4 de noviembre de 2013

Abogado de los Peticionarios:

  Lcdo. Carlos E. Días Olivo

Materia: Resolución del Tribunal con Votos de Conformidad y Votos Particulares de Conformidad

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ex Parte:

Asociación de Periodistas de
Puerto Rico (ASPRO), el Taller          MC-2013-59
de Fotoperiodismo, Inc., la
Asociación de Fotoperiodistas
de Puerto Rico y el Overseas
Press Club

      Peticionarios

RESOLUCIÓN

San Juan, Puerto Rico, a 4 de noviembre de 2013.

      Examinada la *Petición Especial de Autorización al Amparo del Canon XV de los de Ética Judicial y del Programa Experimental para el Uso de Cámaras Fotográficas y Equipo Audiovisual en los Procesos Judiciales* presentada por el Taller de Fotoperiodistas, Inc., la Asociación de Periodistas de Puerto Rico (ASPRO), la Asociación de Fotoperiodistas de Puerto Rico y el Overseas Press Club, se declara con lugar.

      Los gremios periodísticos deberán regirse según lo provisto en el *Reglamento del Programa Experimental para el Uso de Cámaras Fotográficas y de Equipo Audiovisual de Difusión por los Medios de Comunicación en los Procesos Judiciales.*[1]

      Notifíquese por fax, teléfono y por la vía ordinaria.

---

[1] *In re: Enmda. Canon 15 Ética Judicial*, res. el 19 de abril de 2013, 2013 T.S.P.R. 45, 188 D.P.R. _____ (2013).

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton emite un Voto de Conformidad al cual se unen los Jueces Asociados señores Martínez Torres y Estrella Martínez. El Juez Asociado señor Martínez Torres emite un Voto Particular de Conformidad. El Juez Asociado señor Kolthoff Caraballo emite un Voto de Conformidad. El Juez Asociado señor Estrella Martínez emite un Voto Particular de Conformidad al cual se unen el Juez Presidente señor Hernández Denton y el Juez Asociado señor Martínez Torres.

El Juez Asociado señor Rivera García hace constar la siguiente expresión a la cual se une la Jueza Asociada señora Pabón Charneco:

El Juez Asociado Rivera García proveería no ha lugar a la solicitud de los peticionarios toda vez que la misma queda fuera del alcance de la Resolución ER-2013-1 emitida por este Tribunal y el *Reglamento del Programa Experimental para el Uso de Cámaras Fotográficas y de Equipo Audiovisual de Difusión por los Medios de Comunicación en los procesos Judiciales*. En aquel momento la decisión unánime de esta Curia fue establecer un Programa Experimental en las salas de recursos extraordinarios del Centro Judicial de San Juan. Conforme a lo allí dispuesto, al final de ese periodo, el cual culmina en julio de 2014, el Tribunal deberá evaluar exhaustivamente la efectividad del uso de los referidos equipos. Por lo tanto, resulta prematura cualquier solicitud a los fines de ampliar lo que autorizamos mediante la referida resolución, sin antes contar con el beneficio de una evaluación de ese periodo experimental.

La Jueza Asociada señora Fiol Matta y la Juez Asociada señora Rodríguez Rodríguez no intervinieron.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ex parte

ASOCIACIÓN DE PERIODISTAS DE
PUERTO RICO (ASPRO). EL TALLER DE          MC-13-59
FOTOPERIODISMO, INC., LA
ASOCIACIÓN DE FOTOPERIODISTAS
DE PUERTO RICO Y EL OVERSEAS
PRESS CLUB

      Peticionarios

Voto de Conformidad emitido por el Juez Presidente SEÑOR HERNÁNDEZ
DENTON al cual se unen los Jueces Asociados SEÑOR MARTÍNEZ TORRES y
SEÑOR ESTRELLA MARTÍNEZ

San Juan, Puerto Rico, a 4 de noviembre de 2013.

En un acto de avanzada, el 19 de abril de 2013, este Tribunal enmendó el Canon 15 de Ética Judicial, 4 L.P.R.A. Ap. IV-B, con el propósito "de acercar cada vez más nuestro sistema de justicia a los más altos valores y niveles de transparencia, de fomentar la confianza del pueblo en su Judicatura y de garantizar el acceso de la ciudadanía". In re: Establecimiento del Programa Experimental para el Uso de Cámaras Fotográficas y de Equipo Audiovisual de Difusión por los Medios de Comunicación en los Procesos Judiciales Celebrados en las Salas de Recursos Extraordinarios del Centro Judicial de San Juan, 2013 T.S.P.R. 45, 188 D.P.R. ___ (2013). A raíz de ese proceso, el nuevo Canon 15, *supra*,

permite que se tomen "fotografías o video en el salón del tribunal durante la celebración de sesiones judiciales o recesos, radiodifundir o televisar procedimientos judiciales, solamente **según lo autorice el Tribunal Supremo mediante orden, regla o norma"**. (Énfasis suplido.)

En el día de hoy, está ante nuestra consideración una petición presentada por la Asociación de Periodistas de Puerto Rico, el Taller de Fotoperiodismo, la Asociación de Fotoperiodistas de Puerto Rico y el Overseas Press Club para que se les autorice la grabación y transmisión de la vista de sentencia del caso *Pueblo v. Malavé Zayas* pautada para el 4 de diciembre de 2013 en el Centro Judicial de Caguas. Los gremios periodísticos argumentan que la transmisión no viciará el proceso judicial, pues un jurado ya emitió un veredicto y la vista es de carácter procesal. Nos invitan a extender "de forma circunspecta y a manera de ensayo, la operación del plan experimental en el contexto de los procesos penales". Por último, señalan que se comprometen a adherirse estrictamente al Reglamento del Programa Experimental para el Uso de Cámaras Fotográficas y Equipo Audiovisual de Difusión por los Medios de Comunicación en los Procesos Judiciales (Programa Experimental).

Desde la aprobación del nuevo Canon 15, *supra*, solo hemos permitido la toma de fotografías o video en las sesiones judiciales en las Salas Especializadas de Recursos Extraordinarios del Centro Judicial de San Juan mediante el Programa Experimental, el cual fue aprobado simultáneamente a la enmienda del canon. Hasta ahora, aunque falta por concluir

el año para evaluar los resultados, el programa experimental ha tenido una excelente aceptación por parte de la prensa y de los dos jueces encargados de las Salas de Recursos Extraordinarios. Esto últimos han podido manejar con mucha efectividad los procesos, manteniendo el decoro y la dignidad del Tribunal. Además, los procesos judiciales han podido fluir con naturalidad. En efecto, los medios tecnológicos recientes permiten divulgar los procedimientos sin interrupciones mayores. En este sentido, hemos recibido una evaluación positiva del proyecto.[2] De hecho, ha sobrepasado las expectativas de los diferentes sujetos involucrados.

Entendemos que el éxito que ha tenido el proyecto experimental se debe en gran parte a que la prensa ha sido muy cautelosa con la transmisión y se ha ajustado a las reglas que le impusimos mediante el Reglamento del Programa Experimental. Para los gremios periodísticos ha sido un reto y una mayor responsabilidad. Además, ha requerido su activa colaboración. De hecho, podemos afirmar que los medios de comunicación han contribuido a su implementación.

Ahora, estamos ante una petición de la prensa que nos invita a abrir la transmisión a un procedimiento criminal que se encuentra en la etapa de sentencia. A esos efectos, debemos ponderar el derecho a un juicio justo con el derecho a la libertad de prensa. Consideramos que esta solicitud nos

---

[2] El 11 de octubre de 2013, se celebró el seminario *Tensiones y torsiones en la comunicación judicial – ética judicial y medios de comunicación* en el cual participaron la Juez Giselle Romero García, el Juez Ángel Pagán Ocasio, jueces asignados a las Salas de Recursos Extraordinarios, y el Lcdo. Walter Soto León, quien es abogado y periodista. En la actividad, estos compartieron sus impresiones positivas sobre el inicio y desarrollo del Programa Experimental.

brinda una excelente oportunidad para, a modo excepcional y experimental, evaluar los efectos de la transmisión de los procesos penales en las etapas posteriores a la emisión de un fallo o veredicto. Por esa razón, estamos conformes con conceder la solicitud en este caso. De esta forma, continuamos el camino de apertura y accesibilidad de la transmisión de los procesos judiciales.

Claro está, al acceder a lo solicitado, consideramos cuidadosamente que este caso se encuentra en la etapa de vista de sentencia donde un jurado deliberó y adjudicó la responsabilidad penal del acusado. O sea, no estamos ante una petición para transmitir el juicio o la vista preliminar, las cuales son etapas más sensitivas del proceso criminal. En este sentido, entendemos que mediante la transmisión de dicha vista el acusado no sufrirá un perjuicio y no existe un riesgo de que se afecte la administración de la justicia. Al contrario, sostenemos que se abona a la fiscalización de nuestro sistema al permitir que el proceso de dictar sentencia se divulgue al público de la manera más transparente posible.

El nuevo Canon 15, *supra*, y el Programa Experimental son dos herramientas que nos permiten continuar diseñando la política institucional de la Rama Judicial sobre el uso de cámaras fotográficas y equipo audiovisual en los tribunales. Véase In re: Establecimiento del Programa Experimental para el Uso de Cámaras Fotográficas y de Equipo Audiovisual de Difusión por los Medios de Comunicación en los Procesos Judiciales Celebrados en las Salas de Recursos

<u>Extraordinarios del Centro Judicial de San Juan</u>, *supra*, (Voto de Conformidad emitido por el Juez Presidente señor Hernández Denton). Con esta petición, evidenciamos que hemos dado un gran paso en ese camino hacia un sistema de justicia más transparente y accesible a todos. De ahora en adelante, este Tribunal deberá velar por darle vida al nuevo Canon 15, *supra*, mediante las concesiones que se soliciten, haciendo un balance caso a caso, con un gran sentido de justicia y garantizando los derechos constitucionales de las partes.


                                    Federico Hernández Denton
                                        Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ex Parte:

Asociación de Periodistas de
Puerto Rico (ASPRO), el
Taller de Fotoperiodismo,
Inc., la Asociación de           MC-2013-059
Fotoperiodistas y el Overseas
Press Club

Voto Particular de Conformidad emitido por el Juez Asociado señor
MARTÍNEZ TORRES

En San Juan, Puerto Rico, a 4 de noviembre de 2013.

Estoy conforme con la Resolución que hoy emite este Tribunal. En ella, se permite que miembros de la prensa utilicen cámaras fotográficas y equipo audiovisual durante el acto de sentencia de un caso de naturaleza penal. Sin lugar a dudas, la decisión de este asunto que cuenta con el voto de conformidad del Juez Presidente señor Hernández Denton, el Juez Asociado señor Kolthoff Caraballo, el Juez Asociado señor Feliberti Cintrón, el Juez Asociado señor Estrella Martínez y el mío constituye un avance histórico. Para beneficio de todos, creo que es oportuno recapitular de forma

breve los antecedentes que han permitido que nuestro Pueblo tenga libre acceso a los procedimientos judiciales.

I

En 2005 este Tribunal aprobó unos Cánones de Ética Judicial en los que se reafirmaron los principios que constituyen la base de las normas éticas. 4 L.P.R.A. Ap. IV-B. Sin embargo, en esa ocasión <u>los entonces integrantes de este Foro</u> dejaron inalterado el entonces Canon XVIII de 1977, 4 L.P.R.A. Ap. IV-A, ahora Canon 15, <u>supra</u>, que trata sobre la solemnidad de los procedimientos judiciales.[3] Ese precepto ético impone el deber a los jueces de mantener el proceso judicial en un ambiente inalterable de solemnidad y respeto. En su texto original, el Canon 15, <u>íd</u>., prohibía la toma de fotografías y las grabaciones de video o audio, así como la difusión de los procesos judiciales por radio o televisión, excepto en ocasiones ceremoniales o para propósitos educativos.

Cuando juramenté como Juez Asociado de este Tribunal mencioné lo siguiente:

> [D]ebemos prestar particular atención a la transparencia en el desempeño de nuestras funciones. Debemos aspirar a que la justicia sea de fácil acceso para todos y que nuestros procedimientos no obstaculicen el que los ciudadanos se enteren de cómo se atienden sus causas. Por el contrario, debemos procurar que los ciudadanos comprendan cada vez más cómo funciona esta Rama. Para ello debemos utilizar los adelantos tecnológicos disponibles. Incluso, en esa misma línea de pensamiento, creo que es tiempo de replantearnos si todavía se justifica la prohibición de la transmisión de los procedimientos judiciales por vídeo y por audio.

---

[3] El Juez Presidente señor Hernández Denton, la Jueza Asociada señora Fiol Matta y la Juez Asociada señora Rodríguez Rodríguez eran integrantes de este Foro en ese entonces.

*Ceremonía de Juramentación*, 175 D.P.R. XCVII (2009).

Agraciadamente, la preocupación que expresé en mi juramentación no cayó en oídos sordos. En *In re Enmda. Canon 15 Ética Judicial*, res. el 19 de abril de 2013, 2013 T.S.P.R. 45, 2013 J.T.S. 48, 188 D.P.R. __ (2013), este Foro enmendó el Canon 15 de Ética Judicial, *supra*. Su redacción actual es la siguiente:

> Se podrán tomar fotografías o video en el salón del tribunal durante la celebración de sesiones judiciales o recesos, y radiodifundir o televisar procedimientos judiciales, solamente según lo autorice el Tribunal Supremo mediante orden, regla o norma. Éstas garantizarán el acceso del público a los procedimientos judiciales sin que se afecte el logro de un juicio justo e imparcial, sin interrumpir el proceso judicial y sin menoscabar la sana administración de la justicia. *Íd*.

Como se puede apreciar, la nueva redacción del Canon 15, *íd*., representa un cambio radical de política pública por parte de este Tribunal. El espíritu del nuevo Canon 15 es garantizar la transparencia de los procedimientos judiciales.

II

Coincido con los peticionarios en que, en esta etapa de los procedimientos, la transmisión de la vista de sentencia no causa un perjuicio al acusado. Ya el Sr. Ángel Malavé Zayas fue encontrado culpable por un jurado. La vista de sentencia en este caso es de carácter puramente procesal. Véase Regla 163 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Además, el uso de cámaras en

procedimientos penales está más que ensayado en otras jurisdicciones, por lo que no hay que temerle.

Permitir el acceso a la prensa en este asunto adelanta el objetivo importante al que me comprometí desde que juramenté como Juez Asociado de esta Curia: abrir las puertas de la Rama Judicial para mantener informado al Pueblo de Puerto Rico sobre los procedimientos que se desarrollan en nuestros tribunales. De esa forma, nuestro Pueblo podrá constatar que esta Rama Constitucional trabaja con gran sentido de laboriosidad e integridad.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ex Parte:

Asociación de Periodistas de
Puerto Rico (ASPRO), el Taller          MC-2013-59
de Fotoperiodismo, Inc., la
Asociación de Fotoperiodistas
de Puerto Rico y el Overseas
Press Club

     Peticionarios


Voto de Conformidad emitido por el Juez Asociado señor Kolthoff
Caraballo


San Juan, Puerto Rico, a 4 de noviembre de 2013.

En el día de hoy -aunque en etapa experimental- este Tribunal da otro paso de avance hacia un sistema de justicia más transparente. A su vez, claro está, la Prensa alcanza otra importante victoria y, con eso, el País fortalece su democracia. Por primera vez en nuestra jurisdicción se permite a los medios televisivos grabar en el salón de sesiones parte de un proceso criminal.

Por la importancia que estoy convencido comprende este asunto para el mejoramiento de la Rama Judicial, y el impacto positivo que percibo

que ello representa en la confianza de nuestro Pueblo, el 28 de febrero de 2011 me expresé por primera vez públicamente en torno a este tema en uno de los periódicos del País.[4] En ese momento señalé que estaba convencido de que una Prensa responsable ayuda a depurar con su presencia todos los componentes del sistema judicial.

**Es claro que una Prensa más libre en el interior de nuestras salas judiciales es un gran motivador para que tanto jueces, abogados de las partes, fiscales, procuradores, en fin todo profesional del derecho se esfuerce aún más por cumplir plenamente su rol.** Eso, además del tremendo beneficio que representa el que, desde la tranquilidad y comodidad de sus hogares, los ciudadanos de nuestro País puedan observar y advertir, de primera mano, lo que ocurre en el escenario judicial.

No obstante, y como suele ocurrir, la llegada de tal progreso acarrea sus riesgos. Imbricado por sus grandes beneficios, yace en el equipaje de este particular avance otra realidad que también advierto no podemos de ninguna manera eludir. En 1996, en una comparecencia ante una sub-comisión del Comité de Apropiaciones del Congreso de Estados Unidos, el ahora retirado Juez Asociado del Tribunal Supremo de Estados Unidos, David Souter, señaló

---

[4] El Nuevo Día, http://www.elnuevodia.com/columna-transparentes-1200444.html (última visita el 2 de noviembre de 2013).

que el día que una cámara entrara a una vista oral en el Tribunal Supremo federal sería sobre su cadáver.[5]

Sin embargo, lo que más llamó mi atención de las palabras del Juez Souter fue la experiencia de vida que este esbozó como motivo para su expresión. Souter señaló que cuando fue juez en el Estado de New Hampshire, la utilización de las cámaras había afectado su comportamiento en el estrado. Esto, por su convencimiento de que alguna pregunta que hiciera pudiera ser sacada fuera de contexto en los noticiarios mañaneros del próximo día. La Rama Judicial "no es parte de la industria del entretenimiento", concluyó el Juez Souter. Estas expresiones deben ser consideradas con profunda reflexión.[6] Para mí no existe duda de que el temor del Juez Souter tiene fundamento.

### Un poco de historia y precedente judicial

Todo esto se ve con mayor claridad si inyectamos una pincelada de historia que nos ayude a entender la razón que motivó, en gran parte, esta aversión a los medios televisivos en las salas de justicia. Aversión que ha ido disminuyendo aceleradamente a través de los años, pero que todavía persiste en varias jurisdicciones.

Todo inició con lo ocurrido durante el juicio criminal contra Bruno Hauptmann, acusado, convicto y

---

[5] The New York Times, www.nytimes.com/1996/03/30/us/on-cameras-in-supreme-court-souter-says-over-my-dead-body.html (última visita el 2 de noviembre de 2013).

[6] Antes de ser Juez Asociado del Tribunal Supremo federal, el Juez Souter fue juez superior y juez del Tribunal Supremo del Estado de New Hampshire. Creo, entonces, que podríamos estipular su testimonio como uno pericial.

ejecutado por lo que se denominó a mediados de la década de los 30 como "el crimen del siglo": el secuestro y asesinato del hijo de apenas 20 meses del notorio aviador Charles Lindbergh. Durante el juicio, Hauptmann se sentó en la silla de los testigos en una sala repleta de periodistas de diversos medios de comunicación y su testimonio fue grabado por las cámaras presentes. El problema sobrevino, en parte, por el gran "circo mediático" que se desarrolló cuando la grabación del testimonio del acusado Hauptmann fue presentada en distintos cines a través de toda la Nación estadounidense, aun en contra de las órdenes del Tribunal. Además, la conmoción que provocó el juicio produjo que más de 200 reporteros constantemente atestaran el salón, muchos con sus cámaras de filmación y fotografía, grabando y tomando fotos con sus "flashes". Finalizado el proceso, Hauptmann apeló su convicción señalando, entre otros errores, la distracción desmedida que se produjo a causa de toda la cobertura mediática. No obstante, el Tribunal Supremo federal denegó la petición de *certiorari*.[7]

Ahora bien, como consecuencia de lo ocurrido en el juicio contra *Hauptmann*, en 1937 la American Bar Association aprobó en su modelo de Código de Conducta Judicial el notorio Canon 35, que prohibía el uso de cámaras de todo tipo en los juicios. Eso motivó que prácticamente todos los estados -con la excepción de dos- adoptaran ese canon.

---

[7] State v. Hauptmann, 296 U.S. 649 (1935); *cert.* denied.

Con el surgimiento, a mediados de los años 50, de la industria televisiva en los Estados Unidos, volvió a dilucidarse  la controversia en torno a si la presencia de las cámaras de televisión durante un proceso judicial podían ser perjudiciales al derecho constitucional a un juicio justo e imparcial que cobija a todo acusado.  En 1965, en Estes v. Texas, 381 U.S. 532 (1965), el Tribunal Supremo federal pareció contestar tal interrogante en la afirmativa, al revocar la convicción por estafa ("swindling") del empresario Billie Sol Estes.  El juicio criminal contra el señor Estes -quien era amigo personal del entonces Presidente Lyndon B. Johnson- fue transmitido (en parte en vivo y en parte diferido) por radio y televisión, con múltiples restricciones en varias instancias.

Como se reseña detalladamente en la Opinión de la Corte Suprema federal en *Estes*, durante el juicio la sala estuvo todo el tiempo atestada de periodistas, con al menos 12 camarógrafos, cantidad de cables por todo el suelo, y múltiples micrófonos sobre el estrado del juez, frente al estrado del jurado, de los abogados del Ministerio Público y de la Defensa.  Los camarógrafos intentaron, incluso, hacer tomas de los documentos que el acusado tenía ante sí mientras estaba sentado en la mesa de la Defensa junto a sus abogados. Todo esto provocó un trastorno considerable al proceso judicial.

Además, durante los dos días que duró el juicio, los medios de comunicación comentaron extensamente sobre

el mismo, reprodujeron los segmentos grabados por las cámaras e hicieron una selección del material que ellos entendían que servía mejor a sus fines periodísticos. Ante todo esto, el Tribunal Supremo federal finalmente revocó la convicción del señor Estes al señalar, entre otros fundamentos, que el intenso clamor público resultante de la cobertura de radio y televisión durante el proceso judicial constituyó una violación al derecho a un juicio justo e imparcial. En su Opinión, la Corte Suprema federal llegó, incluso, a señalar que "los juicios televisados [eran], por lo tanto, ajenos a nuestro sistema".[8]

### El importante caso de Chandler v. Florida, infra

Sin embargo, en 1981 el Tribunal Supremo federal cambió su posición en torno a este asunto.[9]  En Chandler v. Florida, 449 U.S. 560, (1981), el Alto Foro judicial atendió nuevamente el tema al enfrentarse a la controversia sobre "si, consistente con las garantías constitucionales, un Estado podía proveer cobertura radial, televisiva y fotográfica de un juicio criminal para difusión pública, aún con la objeción del acusado".

Chandler v. Florida, supra, fue un caso que atrajo la atención de los medios de comunicación por tratarse de dos policías del Condado de Miami Beach acusados de

---

[8] Estes v. Texas, 381 U.S. 532, 549 (1965).

[9] Aunque lo cierto es que inmediatamente después de Estes v. Texas, supra, el Tribunal Supremo federal había comenzado a dar indicios de cambio en su postura, particularizando las circunstancias de Estes. Véanse: Sheppard v. Maxwell, 384 U.S. 333 (1966); Murphy v. Florida, 421 U.S. 794 (1975); Nebraska Press Assn. v. Stuart, 427 U.S. 539(1976).

conspiración y robo. Además, el testigo principal del Ministerio Público era un joven radio aficionado que escuchó por casualidad una conversación que los acusados sostuvieron por el sistema de radio (*walkie-talkie*) de la Policía. Durante el juicio, una cámara de televisión transmitió en su totalidad el testimonio del radio aficionado; no se transmitió ninguna de la prueba de la Defensa y finalmente sí se transmitieron los argumentos finales de las partes.

En *Chandler,* el Tribunal Supremo federal por voz del entonces Juez Presidente Warren E. Burger, definitivamente dejó atrás la idea de que los juicios televisados son ajenos a nuestro sistema. El Tribunal aclaró que <u>Estes v. Texas</u>, *supra*, **no** estableció una regla constitucional dirigida a que toda cobertura fotográfica, radial o televisiva de juicios criminales constituye una negación inherente del debido proceso de ley. *Estes* **no** pretendió ser una prohibición absoluta a que los Estados pudieran experimentar con una tecnología en desarrollo que, en términos de forma de comunicación masiva, se encontraba relativamente en pañales en 1964 cuando *Estes* fue resuelto y que, aún ahora, se encuentra en un estado de continuo cambio.

Luego de aclarar el alcance de <u>Estes v. Texas</u>, *supra*, la Corte Suprema federal determinó que los peticionarios en *Chandler* no habían probado con exactitud que la presencia de las cámaras durante el juicio afectara la capacidad del jurado para decidir el caso considerando

únicamente la evidencia ante sí o que el juicio se afectara por el impacto -en cualquiera de los participantes del proceso- de la presencia de las cámaras y la exposición a la transmisión.[10]

No existen dudas en términos de que <u>Chandler v. Florida</u>, *supra*, constituye una luz verde a los estados para experimentar con la posibilidad de transmisiones radiales y televisivas, aún en procesos criminales. Evidentemente, corresponde a los Estados y a Puerto Rico el que, de acuerdo a nuestras expectativas, establezcamos los mecanismos necesarios para conseguir en nuestros procesos judiciales la mejor cobertura posible de los medios, salvaguardando los derechos de la partes, y muy en especial de los acusados.

***A manera de conclusión***

Como señalé, este proyecto experimental está aún en ciernes. No obstante, mi visión es cada vez más clara y mi posición como parte de esta Curia es más firme. **Con la excepción de los asuntos que se dilucidan en las salas de familia y menores, estableciendo las restricciones que se entiendan necesarias, evaluando caso a caso y, sobre todo, concediendo una total discreción a los jueces de instancia,[11] creo que es posible transmitir, incluso de**

---

[10] <u>Chandler v. Florida</u>, 449 U.S. 560, 581 (1981).

[11] Es menester reseñar el hecho de que, como establece la Regla 7 (c) del <u>Reglamento del Programa Experimental para el Uso de Cámaras Fotográficas y de Equipo Audiovisual de Difusión por los Medios de Comunicación en los Procesos Judiciales</u>, la determinación de un tribunal de instancia de permitir o no la transmisión de un proceso judicial no es revisable, excepto que el propio tribunal reconsidere su posición.

**forma televisiva, cualquier proceso judicial, en cualquier etapa.**

Como hemos visto, el aspecto más crítico de esta odisea es lo concerniente a los procesos en las salas criminales. Los derechos de los acusados a un juicio justo e imparcial como parte del debido proceso de ley constitucional, y la seguridad de los testigos, jurados y demás protagonistas del procedimiento judicial criminal, son aspectos de la más alta importancia y preocupación. Sin embargo, estoy convencido de que estos son asuntos en los que se pueden hacer los ajustes necesarios para asegurar la transmisión del proceso. De todos modos, debemos recordar que "no estamos inventando la rueda".[12]

Sin embargo, y por otro lado, tenemos que aceptar que el temor del Juez Souter en 1996 es más real hoy. Los medios de comunicación en el mundo -y Puerto Rico, sin duda, no es la excepción- tienen una influencia extraordinaria en la opinión pública. **Por eso, la Prensa tiene que procurar que cada uno de sus componentes cumpla responsablemente con su rol, pues nadie fiscaliza a la Prensa, sino ella misma. Una actitud desdeñada en este aspecto podría con el tiempo, y como ha ocurrido en otras jurisdicciones, provocar que se cierre nuevamente esta puerta.**

Con relación a lo que cada medio informativo o de entretenimiento terminará haciendo con el material que se

---

[12] Actualmente más de 37 estados permiten una cobertura total de sus procesos judiciales, incluyendo juicios criminales.

transmite desde nuestras salas de justicia, cómo lo editarán y con qué propósito, en realidad es un asunto que el Pueblo tendrá que juzgar como el último y real juez supremo. Solo les recuerdo -con quizás fastidiosa insistencia- que el temor del Juez Souter tiene hoy más que nunca gran fundamento. Por esto, les reitero lo dispuesto en la Resolución mediante la cual aprobamos las enmiendas al Canon 15 de los Cánones de Ética Judicial:

> **Toda persona deberá actuar responsablemente al difundir información de un proceso judicial, por lo que deberá asegurarse que la información que divulgue concuerde fielmente con la realidad de lo ocurrido en el proceso judicial.**[13] (Énfasis suplido).

Corresponde a esta Curia, como ocurre con la determinación que hoy emite la Mayoría, mantener una actitud de apertura y un paso de avanzada en este asunto. Sé que el reto es grande. Aún así, elijo confiar en que el País sabrá apreciar los beneficios de esta apertura y que los medios de comunicación sabrán corresponder al apoyo que reciben de todos nosotros.

Por todo lo anterior, estoy conforme con la decisión de la Mayoría.

Erick V. Kolthoff Caraballo
Juez Asociado

---

[13] *In re Enmda. Canon 15 Ética Judicial*, res. el 19 de abril de 2013, 2013 T.S.P.R. 45, 188 D.P.R. __ (2013).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ex Parte:

Asociación de Periodistas de
Puerto Rico (ASPRO), el Taller
de Fotoperiodismo, Inc., la                    MC-2013-59
Asociación de Fotoperiodistas
de Puerto Rico y el Overseas
Press Club

Voto Particular de Conformidad emitido por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ al cual se unen el Juez Presidente SEÑOR HERNÁNDEZ DENTON y el Juez Asociado SEÑOR MARTÍNEZ TORRES

San Juan, Puerto Rico, a 4 de noviembre de 2013.

En ocasión de la aprobación de la enmienda al Canon 15 de Ética Judicial y el establecimiento de un Programa Experimental para autorizar el uso de cámaras fotográficas y de equipo audiovisual, por parte de los medios de comunicación en determinadas Salas de Recursos Extraordinarios, advertí que esos pasos de avance no deben constituir un impedimento para "… continuar con los esfuerzos simultáneos dirigidos a alcanzar la plenitud de acceso a los procesos judiciales nuestro esquema constitucional".[14]

_____

[14]In re: Establecimiento del Programa Experimental para el Uso de Cámaras Fotográficas y de Equipo Audiovisual de Difusión por los Medios de Comunicación en los Procesos Judiciales Celebrados en las Salas de Recursos Extraordinarios del Centro Judicial de San Juan, 2013

La Resolución emitida previamente por este Tribunal no tuvo el efecto de meramente implantar un Programa Experimental. Su impacto fue mucho mayor, toda vez que prácticamente aprobamos un nuevo Canon 15 de Ética Judicial, que estableció una política pública de mayor apertura y acceso de la prensa y la ciudadanía a los procesos judiciales. Nótese que el nuevo Canon 15 extendió inmediatamente a todas las salas civiles, **criminales**, de familia y menores el uso de computadoras portátiles, teléfonos celulares, tabletas, entre otros dispositivos electrónicos o equipo similar. De esta forma, la prensa y los abogados y abogadas pueden recopilar información y transmitirla con mayor precisión y agilidad, para beneficio de la ciudadanía. Obviamente, bajo unas normas que garanticen que tales acciones no interfieran con los trabajos de la sala, sean acorde a los mandatos éticos y no infrinjan las garantías constitucionales de las partes.

No veo impedimento para que autoricemos, bajo esa nueva política pública, la petición de la prensa. Por el contrario, la presente autorización contribuirá a poder obtener recomendaciones e insumos adicionales del programa experimental, desde el ámbito de los procedimientos criminales.

Sabido es que "… el acusado no es el único acreedor del derecho fundamental a un juicio público, pues la ciudadanía y la prensa también pueden invocarlo para lograr el acceso

---

T.S.P.R. 45, Voto particular de conformidad del Juez Asociado señor Estrella Martínez, a la pág. 2.

a dicho procedimiento". <u>Pueblo v. Pepín Cortés</u>, 173 D.P.R. 968, 977 (2008). Los derechos a la libre expresión, asociación y libertad de prensa, garantizados por la Sec. 4 del Art. II de la Constitución de Puerto Rico, L.P.R.A. Tomo 1, y por la Primera Enmienda de la Constitución Federal, así como el derecho de acceso a la información en poder del Estado, requieren que reflexionemos en torno a la realidad social de que ya no puede limitarse la publicidad del juicio a las personas presentes como espectadores. Debemos nutrirnos de la experiencia y de la tendencia mayoritaria a nivel de los Estados Unidos y en múltiples jurisdicciones democráticas. No podemos obviar que "[l]a asistencia personal y directa a los juicios ha perdido importancia y, en contrapartida, se ha ampliado el círculo de los participantes indirectos a los que la prensa, la radio y la televisión transmiten las noticias judiciales."[15]

Si no evolucionamos y reconocemos esta tendencia, sencillamente la naturaleza de la publicidad de los procesos judiciales quedará desvirtuada. Un razonamiento contrario, nos conduciría al absurdo de reconocer que es válido que un periodista escriba y transmita inmediatamente en *twitter* las palabras del juez al dictar la sentencia, pero que esas mismas palabras del juzgador no puedan ser radiodifundidas o televisadas simultáneamente. Más importante aún, no veo la razón por la cual no podamos permitir que el acceso a la información fluya

---

[15] (http://www.catedrahendler.org/doctrina_in.php?id=40) última visita 4 de noviembre de 2013.

inmediatamente, más allá del sector de la población que disfruta de conexión a la red de internet.

En la petición particular ante nos, la prensa enmarca su reclamo en un compromiso de adherirse estrictamente al Reglamento del Programa Experimental para el Uso de Cámaras Fotográficas y de Equipo Audiovisual de Difusión por los Medios de Comunicación en los Procesos Judiciales. Ello, en reconocimiento al control que tendrá el juez del Tribunal de Primera Instancia para administrar los procesos adecuadamente. De igual forma, reconozco que el juzgador del foro primario tiene las herramientas necesarias para proteger cualquier información, datos o identidades que sean necesarias proteger. Es decir, considero que existe el andamiaje reglamentario para implantar las medidas protectoras que sean requeridas para no menoscabar las garantías constitucionales que puedan activarse a favor de alguna de las partes en un procedimiento criminal.

Ciertamente, acceder a la petición formulada por el Taller de Fotoperiodistas, Inc., la Asociación de Periodistas de Puerto Rico y el Overseas Press Club constituye "un peldaño adicional en ese proceso reformista".[16] Como bien anticipé, "… nuestra jornada hacia una mayor transparencia y al acceso pleno de la ciudadanía y la prensa a nuestros procedimientos judiciales no debe limitarse, ni mucho menos perpetuarse, en el ámbito experimental aquí aprobado. De lo contrario, las huellas de

---

[16] Íd, pág. 4.

apertura marcadas en el día de hoy podrían quedar borradas por la resaca del hermetismo y la ventisca de la secretividad de los procedimientos".[17]

LUIS F. ESTRELLA MARTÍNEZ
Juez Asociado

_____

[17]Íd.